**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CLIFFORD L. QUEEN,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:06-CV-880-Y** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Clifford L. Queen filed this action pursuant to Sections 405(g), Title 42 of the

United States Code for judicial review of a final decision of the Commissioner of Social Security

denying his application for disability insurance benefits under Title II of the Social Security Act.

Queen also applied for supplemental security income (SSI) under Title XVI of the Social Security

Act, but does not challenge the disposition of his SSI application.

Queen filed concurrent applications for disability insurance benefits and SSI in February

2003, alleging disability commencing November 30, 1999. His insured status for purposes of

disability insurance benefits expired September 30, 2002. (Tr. 56, 143). The Social Security Administration denied Queen's applications for benefits both initially and on reconsideration. Queen then requested a hearing before an administrative law judge (the "ALJ"). ALJ Ward D. King held a hearing and on May 13, 2004, issued an unfavorable decision denying both of Queen's applications for benefits. (Tr. 59, 491). The Appeals Council, however, vacated this decision and remanded the case for further development. (Tr. 70).

On September 27, 2005, ALJ King held a second hearing. (Tr. 464). Queen was represented by counsel during the hearing. On January 26, 2006, the ALJ issued a partially favorable decision. The ALJ found that Queen had been under a disability since March 25, 2003, but not before that date. Queen was ineligible for disability insurance benefits because his insured status expired in September 2002,[1] (Tr. 40-53), but the ALJ concluded that Queen was eligible for SSI payments and ordered the appropriate division of the Social Security Administration to contact Queen about the amount of benefits due and any payment requirements. The Appeals Council denied Queen's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir.

_____

[1]    Disability must be established on or before that date to establish entitlement to disability insurance benefits. *See generally Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1080 n.1 (5th Cir. 1981). This date does not affect a claim for SSI benefits; however, SSI benefits cannot be paid for the time preceding an application for benefits even if disability began earlier. *See* 20 C.F.R. § 416.335.

1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527.  Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198.  If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).  A finding at any point in the five-step process that a claimant is

disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.      ISSUES

Queen asserts that he is entitled to disability insurance benefits as provided for in Title II of the Social Security Act. He complains that the ALJ's determination that he was not disabled prior to September 30, 2002, is unsupported by substantial evidence and a product of legal error.

D.      ADMINISTRATIVE RECORD

1.      Treatment History

Queen sustained work-related back and knee injuries injury when he fell off a ladder in November 1999. (Tr. 323, 347). X-rays taken in December 1999 showed degenerative changes of the thoracic spine and the lumbar spine. Magnetic resonance imaging (an MRI) also showed

early degenerative changes along Queen's thoracic spine; dessication of the L1-L2 and L4-L5 intervertebral discs; herniation with encroachment into the left neural foramen at L3-L4 that did not appear to be encroaching on the thecal sac or nerve root; and a generalized bulge at the L5-S1 level. (Tr. 345-46, 354). During a follow-up visit in March 2000, Queen reported pain with palpation of his lumbar spine, and straight leg raising was positive at forty-five degrees on the right. (Tr. 338). Diagnostic studies of Queen's right knee also showed a torn meniscus.

Orthopedic specialist Myron Glickfield, D.O., recommended arthroscopic surgery for Queen's knee injury. (Tr. 341, 343, 347). Queen underwent surgery on his right knee, but was unhappy with the surgical results and continued to complain of knee pain. (Tr. 263, 338).

A lumbar myelogram and a computed tomography (CT) scan were performed May 30, 2000. (Tr. 288). The diagnostic studies showed diffuse lumbar spondylosis,[2] bilateral facet arthropathy,[3] a mild L1-L2 disc bulge, a L3-L4 disc bulge, and a L4-L5 disc bulge. (Tr. 290). Moderate L5 nerve root blunting on the right and a moderate extradural defect at L3-L4 were also observed. (Tr. 289). During a physical therapy visit in August 2000, Queen walked with an antalgic gait. On examination, he was tender to palpation, but demonstrated intact sensation throughout his lower extremities. His deep tendon reflexes were diminished bilaterally. He exhibited a reduced range of motion in his right knee and lumbar spine, reduced strength in his right leg, and an abnormal gait. (Tr. 324). Queen was discharged from therapy the following month due to a lack of attendance. (Tr. 322). He later explained that he stopped attending physical therapy because it was elevating

---

[2] Spondylosis refers to degenerative spinal changes due to osteoarthritis. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1780 (31st ed. 2007).

[3] Arthropathy is defined as any joint disease. *Id*. at 160.

his glucose levels and having a negative effect on his diabetes; however, Queen's endocrinologist, C.W. Spellman, D.O., noted that exercise was one of the best ways to control hyperglycemia. (Tr. 258, 322). Queen also consulted Spellman for paresthesias[4] in his legs and feet and numbness on the left side of his face. Spellman opined that Queen was experiencing the onset of diabetic mononeuropathy.[5] (Tr. 254).

Sofie Weigel, M.D., examined Queen in September 2000. (Tr. 366). A neurological examination revealed muscles of normal bulk and tone, an absent Achilles reflex, and decreased sensation consistent with mild neuropathy. (Tr. 367). The musculoskeletal examination found no lumbar spasms, but Queen complained of pain with extreme flexion or extension. No sacroiliac joint involvement was noted, and straight leg raising was negative in both the sitting and supine positions. Weigel assessed a 4% whole person impairment rating and recommended that Queen return to work, but avoid repetitive flexion, extension activities of the right knee such as bending or crawling, and repetitive climbing. (Tr. 368).

Queen did not seek significant additional medical treatment until 2003. Queen saw Spellman on January 6, 2003, for management of his diabetes. Queen admitted that he had not taken care of himself and had not worked in three years because he was unable to pass a physical examination. Queen complained of pain in his shoulders, low back, and knees. (Tr. 243).

Queen saw orthopedic surgeon Joe Daniels, D.O., in June 2003. (Tr. 395). Queen reported

---

[4] Paresthesia is an abnormal touch sensation, such as burning or prickling of the skin, often in the absence of an external stimulus. *Id.* at 1404.

[5] Neuropathy is a functional disturbance or pathological change in the peripheral nervous system, and may be called mononeuropathy or polyneuropathy to denote whether one nerve or several are involved. *Id*. at 1287.

a ten-year history of back pain, and admitted smoking two packs of cigarettes a day. Clinical examination of Queen's lumbar spine was negative. Queen demonstrated no extensor toe weakness in his lower extremities, and Achilles and patellar reflexes were equal and active bilaterally. Queen exhibited a normal range of motion in all planes without acute muscle spasms or tenderness in his lumbar spine. Queen was able to heel and toe walk, and motor strength was assessed as +5/5. (Tr. 396). Daniels recommended an MRI and a continuation of conservative care.

A July 2003 MRI showed disc protrusions at L3-L4, L4-L5, and L5-S1, with variable degrees of foraminal compromise at these levels. (Tr. 301). Another lumbar spine MRI was performed in August 2003 and interpreted by neuroradiologist Ellis Robertson. Robertson reported that the August 2003 lumbar spine MRI showed mild disc dehydration and spondylosis with disc bulging at the lower levels of the lumbar spine; facet arthropathy at L4-L5 and L5-S1; and a focal midline disc bulge at L4-L5 and, to a lesser extent at L5-S1, but without mass effect on the nerve roots. (Tr. 305). Glickfield recommended epidural steroid injections and referred Queen to Christopher Pratt, D.O. (Tr. 287, 307). Pratt administered lumbar epidural steroid injections on November 10, 2003, and December 22, 2003, but the pain relief was short-lived. (Tr. 310-14, 360).

Glickfield issued a statement in December 2003 in which he opined that Queen was permanently disabled and that this disability began in November 1999. (Tr. 285). Glickfield opined that Queen could sit for fifteen minutes at a time and a total of two hours during an eight-hour workday; stand for ten minutes for a total of one hour during an eight-hour workday; and walk for five minutes. (Tr. 286). Glickfield also opined that Queen would require frequent rest periods

during the day and would probably miss work due to exacerbations of pain. (Tr. 286).

In June 2004, Queen's primary care physician, Jim Guerra, M.D., opined that Queen was in a chronic disabled state with limitations in function and activities that led to an "inability to actively work in a physically demanding environment." (Tr. 402). Guerra based his opinion on Queen's diabetes, hypertension, chronic obstructive pulmonary disease, peripheral neuropathy, and chronic pain from lumbar spondylosis and degenerative disc disease. Guerra noted that surgery had been recommended, but Queen had personal financial constraints. (Tr. 402). In 2005, Guerra opined that Queen's back impairment satisfied the criteria of Listing 1.04, which pertains to spinal disorders. (Tr. 413-16).

    2.        Administrative Hearing

Queen testified that he was born March 25, 1948. (Tr. 468). He completed the fifth grade, but testified that he later tried to obtain his GED and was told that he read at a second-grade level. (Tr. 468).

Queen attributed his medical problems to his fall in November 1999, which injured his left hip, right knee, and back. (Tr. 469). He had not worked since that time. He testified that he had difficulty walking or standing because of numbness, tingling, and an inability to put all of his weight on his leg. Surgery on his right knee had not relieved his symptoms. Queen also complained of low back pain and a pinched nerve that caused tingling and numbness on his right side. Queen testified that he had severe foot problems due to diabetes. He estimated that he could stand for ten or fifteen minutes, sit for twenty minutes, and walk for five or ten minutes. (Tr. 470-71). Queen estimated that he could have lifted about twenty pounds before he had a stroke in 2005. (Tr. 473). Queen testified

that his pain medication made him sleepy. He spent 70% of the day sitting in a recliner and the rest of the time "laying around." (Tr. 475).

Queen's wife also testified that her husband was unable to work because of pain and the side-effects of his medication. (Tr. 477). She had noticed that her husband had difficulty holding on to objects, he was depressed, and he was significantly slower than he used to be. Her husband had tried to obtain surgery, but the insurance company would not pay for it and the family was unable to afford it. (Tr. 479).

Medical expert O.D. Raulston, an orthopedic specialist, also testified. (Tr. 139, 479). Raulston summarized Queen's medical history, and testified that there were conflicting MRI studies from July and August 2003: one of the radiologists had found significant neuroforminal compromise, but a second radiologist had not. Raulston favored the second radiologist's opinion because that radiologist had more training with respect to neurological imaging studies. (Tr. 480). Raulston further testified that, based on the medical records only, Queen's impairments had not met or equaled any listed impairment since November 1999. (Tr. 482). Raulston expressly disagreed with Guerra's statement that Queen met Listing 1.04A because Guerra had noted no findings of motor weakness, muscle weakness, sensory deficits, or deep tendon reflex loss. (Tr. 483-84).

Raulston opined that Queen could lift twenty pounds occasionally and ten pounds frequently; stand or walk for a total of six hours during an eight-hour workday; sit for a total of six hours during an eight-hour workday; climb, balance, or stoop frequently; and crawl, crouch, or kneel occasionally. (Tr. 483). Raulston also opined that Queen should have the option of changing positions every hour, and should not be exposed to any ladder-climbing, working on scaffolds,

temperature extremes, or heavy vibration because of his diabetic neuropathy. Because Queen had complaints of shoulder pain, Raulston also limited Queen to only occasional overhead work with his left arm. (Tr. 483).

The ALJ subsequently asked vocational expert Barbara Dunlap to consider the following hypothetical:

> I'd like you to assume an individual who is closely approaching advanced age. The individual has a fifth grade education, however, the individual reads and writes at the second grade level. The individual has the same work history as Mr. Queen. Assume the individual can perform a full range of light work but with these limitations: Only occasional kneeling, crouching, crawling. Only frequent climbing ramps or stairs, balancing, or stooping. No climbing ladders or scaffolds. No exposure to temperature extremes. No exposure to heavy vibrations. The individual requires a modified sit/stand option, and by that I mean usually able to change positions every hour. Assume the individual cannot perform any of Mr. Queen's past relevant work. In your opinion, are there jobs existing in significant numbers in the national economy that such a person could perform?

(Tr. 487). Dunlap testified that there were jobs that would fit within these restrictions, including unskilled hand labor or simple assembler positions, with 5,000-6,000 jobs in Texas and 80,000 jobs in the national economy; sorter/inspector positions, with 6,000 jobs at the light level in Texas and 80,000 jobs in the national economy; and light packager positions, with 4,000 jobs in Texas and 60,000 jobs in the national economy. (Tr. 487-88). Dunlap testified that her answer would not change if the individual was further limited to overhead use of his left, non-dominant upper extremity on only an occasional basis. (Tr. 488). Dunlap affirmed that there was no conflict between her testimony and the description of the foregoing jobs in the Dictionary of Occupational Titles (DOT).

Dunlap conceded that an individual with a work pace that was less than fifty percent of the

average worker would have difficulty maintaining employment. (Tr. 488). She also characterized a second-grade reading level as "pretty close" to functional illiteracy. When asked about the limitations outlined in Glickfield's assessment, Dunlap testified that an individual with these limitations would be unemployable. (Tr. 489).

3.    ALJ Decision

The ALJ found that Queen had not engaged in substantial gainful activity since November 30, 1999, and also found that Queen had the following impairments: diabetes with peripheral neuropathy; chronic obstructive pulmonary disease; hypertension; a right knee impairment; disc desiccation, degenerative disc disease, and spondylosis of the lumbar spine; lumbar radiculopathy; protruding discs at L3-L4, L4-L5, and L5-S1, with minimal to moderate effacement of the thecal sac, neural foraminal narrowing, and facet arthropathy, but no mass effect on the nerve roots; and a probable cerebrovascular accident. (Tr. 41-42). The ALJ found that these impairments, although severe, did not meet or equal the criteria of any listed impairment. (Tr. 42).

In assessing Queen's residual functional capacity (RFC), the ALJ found that Queen could perform the full range of light work with the following modifications: a sit/stand option; no climbing of ladders or scaffolds; only occasional kneeling, crouching, and crawling; frequent climbing of ramps or stairs; frequent balancing and stooping; and avoidance of temperature extremes or heavy vibrations. (Tr. 43). Queen's RFC precluded him from performing his past relevant work, and the ALJ recognized that the Medical-Vocational Guidelines directed a finding of disability as of Queen's fifty-fifth birthday on March 25, 2003, for a person with Queen's RFC, education, and work experience. *See* 20 C.F.R. Part 404, Subpart P, App. 2, Table No. 2, Rule 202.01. Before that date,

however, the ALJ found that there was other work available in significant numbers that Queen was capable of performing. (Tr. 51-52). Accordingly, the ALJ found Queen was not entitled to disability insurance benefits because he was not disabled prior to the expiration of his insured status. The ALJ found that Queen had met the eligibility requirements for SSI payments, and directed the appropriate administrative division to advise Queen about the payment of SSI benefits. (Tr. 53).

D.    DISCUSSION

1.    Listing 1.04

Queen contends that the ALJ erred in failing to find disability on or before his insured status expired because his back impairment meets or equals Listing 1.04, which provides in relevant part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, App. 1, § 1.04. Queen asserts that he met Listing 1.04A as of his alleged onset date and well before his insured status expired.

The ALJ found that Queen's impairments were not of sufficient severity to meet or equal a listing. The ALJ recognized that Guerra had opined in February 2005 that Queen's back impairment met the criteria of Listing 1.04; however, the ALJ found this opinion was inconsistent with other medical evidence and was also inconsistent with Raulston's testimony during the administrative

hearing. (Tr. 42). The ALJ noted that Guerra began treating Queen in October 2003, and therefore, he was not an examining source with respect to Queen's condition before October 2003. The ALJ also assigned greater weight to Raulston's testimony because Guerra was a general practitioner and Raulston was a board-certified orthopedic surgeon. (Tr. 42).

Queen argues that the ALJ erred in relying on Raulston's testimony because the medical expert was mistaken about the requirements of Listing 1.04A and provided an inaccurate summary of the objective medical evidence. Raulston testified that Queen's impairments did not meet or equal any listed impairment. He dismissed Guerra's statement because Guerra stated that Queen met Listing 1.04 and found evidence of nerve root compression characterized by pain and a positive straight leg raising test, but Guerra did not indicate that Queen experienced motor weakness, sensory loss, or deep tendon reflex loss. (Tr. 413, 483-84). Raulston testified that all of these symptoms are required to meet Listing 1.04A. Raulston's testimony is consistent with the criteria set out in the listing. Queen's argument that Listing 1.04A reads in the disjunctive is contradicted by a review of the language used in the listing.

Queen also complains that the ALJ tried to diminish the evidence of nerve root compression by reasoning that there was no evidence of "mass effect" on the nerve roots, (Tr. 42); however, the ALJ was quoting the findings of the neuroradiologist who interpreted Queen's August 2003 MRI. (Tr. 48). After summarizing the diagnostic tests, the ALJ agreed with Raulston's testimony that the August 2003 deserved more weight because the interpreting physician had better credentials than the radiologist who reviewed Queen's July 2003 MRI. (Tr. 48). Queen has not shown that this explanation is unreasonable or unsupported.

Substantial evidence supports the ALJ's determination that Queen had no impairment or impairments meeting or equaling the severity of a listed impairment. The ALJ did not err in failing to find Queen disabled at step three of the sequential evaluation process.

2.      Claimant Credibility

Queen complains of the ALJ's failure to find his testimony entirely credible.  In evaluating

a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable

impairment that could reasonably be expected to produce the pain or other symptoms.  20 C.F.R. §§

404.1529(b), 416.929(b); SOCIAL SECURITY RULING 96-7p. Once the impairment is found, the ALJ

evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability

to do basic work activities.  20 C.F.R. §§ 404.1529, 416.929.  A claimant's testimony must be

consistent with the objective medical evidence and other available evidence.  *Id*.; 20 C.F.R. §

416.929.  Factors to consider include (1) the  claimant's daily activities; (2) the location, duration,

frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) the medication

used to alleviate the pain; (5) other treatment measures; and (6) other relevant factors.  20 C.F.R.

§ 404.1529(c).   An ALJ's unfavorable credibility evaluation will not be upheld on judicial review

where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the

ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's

subjective complaints.  *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir.1994);  *Abshire v. Bowen*, 848

F.2d 638, 642 (5th Cir. 1988).  The ALJ is not required to give precedence to subjective evidence

over objective medical evidence.  *Hollis*, 837 F.2d at 1385.

The ALJ found that Queen had underlying impairments that could reasonably be expected

to cause the types of symptoms alleged, but further found that Queen's allegations regarding the

extent of his pain and functional limitation were not entirely credible in light of the objective

medical evidence and other evidence.  (Tr. 42).  Queen complains that this finding is insufficient

because it was not accompanied by an explanation or discussion of the reasons for the ALJ's assessment.

The ALJ reviewed Queen's testimony and his wife's testimony, and agreed that Queen experienced some pain, numbness, and tingling as a result of a back impairment and diabetes. (Tr. 45). However, the ALJ found the evidence did not support the degree of pain and limitation alleged, and noted that Queen had estimated that he could walk up to 100 feet before tiring and could lift up to twenty pounds with both arms before he suffered a stroke in 2005. In addition, medical examinations before Queen's stroke had not shown muscle weakness or decreased strength. (Tr. 45).

The ALJ also stated that he had considered Queen's work history in making this determination. Queen asserts that this was inappropriate, but the regulations provide that a claimant's prior work record is one factor to consider in evaluating symptoms. 20 C.F.R. § 404.1529(c)(3).

The ALJ considered Queen's failure to undergo back surgery as another factor in the credibility determination. The ALJ specifically stated that Queen's avoidance of surgery was not evidence of a failure to follow treatment, but it was some evidence that his pain was not as severe as alleged. *See generally* 20 C.F.R. § 404.1530. Whether pain is disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the evidence, and that determination is entitled to considerable deference. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan,* 925 F.2d 123, 128 (5th Cir.1991); *James v. Bowen,* 793 F.2d 702, 706 (5th Cir.1986). Queen has not shown that deference should not be given to the ALJ's assessment, nor has he shown a lack of substantial evidence or legal error that would justify disturbing the ALJ's

credibility determination.

3.     Residual Functional Capacity Assessment

Queen contends that the ALJ failed to give proper weight to Glickfield's treating source opinion and that this failure undermines the ALJ's residual functional capacity (RFC) assessment. Glickfield's assessment, if adopted, would foreclose full-time competitive employment. *See generally* SOCIAL SECURITY RULING 96-8p.

The opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The ALJ assigns controlling weight to the opinion of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). Before rejecting a treating source opinion, the ALJ must address several relevant factors, including the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. § 404.1527(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* SOCIAL SECURITY RULING 96-2p, 96-5p.

Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be completely rejected. In many cases, the opinion may be entitled to the greatest weight and should be adopted even if it does not satisfy the test for controlling weight. SOCIAL SECURITY RULING 96-2p. However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating

physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *See* 20 C.F.R.. § 404.1527(e); *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237.

Queen contends that the ALJ rejected Glickfield's opinions in favor of the testimony of the non-examining medical expert without providing the analysis required by the regulations.

The ALJ recognized that Glickfield had opined that Queen had been unable to work on a continuing or full-time basis since November 1999 and that Guerra had offered a similar opinion in 2004. The ALJ, however, declined to give controlling or significant weight to either opinion because they were inconsistent with the evidence, including the findings of other treating and examining sources. (Tr. 49-50). The ALJ found that Glickfield's records did not reflect that Queen alleged or exhibited the extreme degree of limitation that Glickfield included in his medical source statement, and the ALJ was suspicious of Glickfield's assertion that Queen's disabling limitations had persisted since 1999 because Glickfield did not treat Queen between June 2000 and September 2003. (Tr. 50). The ALJ decided that Glickfield had filled out the disability form in an effort to assist Queen in obtaining benefits, rather than offering objective opinions about Queen's functional abilities. (Tr. 50). The ALJ also disagreed with Guerra's opinions about Queen's disability before October 2003 because Guerra did not begin treating Queen until October 2003. (Tr. 50). Although the ALJ did not specifically state that he was addressing the factors outlined in Section 404.1527(d) in his decision, he substantially complied with the substance and intent of that subsection in evaluating the treating physicians' statements.

Queen asserts that the ALJ should have recontacted Glickfield before rejecting his opinion.

The ALJ has a duty to develop the facts fully and fairly, and if he does not satisfy this duty, his decision is not substantially justified. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir.2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995). If necessary, the ALJ should recontact a treating physician to resolve any doubts or gaps in the record. *Newton*, 209 F.3d at 457-58. *See also* 20 C.F.R. § 404.1512(e); Social Security Ruling 96-5p. But the failure to request additional information from treating or examining sources is reversible error only if prejudicial. The claimant must establish prejudice by showing that, if the ALJ had developed the record, additional evidence would have been produced that might have led to a different decision. *Newton*, 209 F.3d at 458. Queen does not identify what additional evidence the ALJ could have obtained upon recontacting Glickfield that might have altered the ALJ's assessment of Glickfield's opinion or Queen's residual functional capacity. The ALJ properly weighed the treating source opinions, and Queen has not demonstrated a lack of substantial evidence to support the ALJ's decision that those opinions were not entitled to controlling or significant weight.

4.    Illiteracy

Queen also contends that the ALJ failed to fully and fairly develop the record with regard to Queen's illiteracy. The ALJ expressly found that the evidence did not show Queen to be illiterate, and the ALJ declined to include any reading or writing limitations in his decision. (Tr. 52). The ALJ also reasoned that Queen's literacy was not outcome-determinative because the vocational expert was able to identify suitable jobs even when the limitation of a second-grade reading level was included in the hypothetical. The ALJ overlooked Rule 202.09, which directs a finding of disability for an illiterate worker of Queen's age, work history, and strength limitations. *See* 20

20

C.F.R. Part 404, Subpart P, App. 2, Table No. 2, Rule 202.09. For individuals like Queen who have both strength limitations and nonexertional limitations, the adjudicator must consult appendix 2 to determine if an individual of a particular age, education and work history can be found disabled based on his strength limitation alone. *See* 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)2.

The regulations define illiteracy as the inability to read or write. 20 C.F.R. § 404.1564(b)(1). A claimant is considered illiterate if he is unable to read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. *Id*. Queen testified that he completed the fifth grade and had been tested as reading at a second-grade level. Queen also informed the field officer who interviewed him as part of the disability application process that he required assistance completing the disability paperwork because he was unable to read or write. The field officer noted that Queen was able to spell his doctor's name and the medication he was taking. (Tr. 197). The vocational expert also testified that a person with reading and writing skills at a second-grade level was "pretty close" to being functionally illiterate.

It is uncontroverted that Queen has little formal education, but there is insufficient evidence of his actual reading and writing abilities despite Queen's allegations of significant impairment in this area. The ALJ, although aware of Queen's allegations, did not develop the record beyond Queen's testimony. The record lacks substantial evidence to support a finding that Queen is either literate or illiterate as that term is defined in the regulations. Remand is required so that the issue of Queen's reading and writing abilities can be developed.

5. Vocational Expert Testimony

Queen asserts that the ALJ erred in finding that there is other work available in significant

numbers that Queen can perform and that this finding is not supported by substantial evidence. Queen challenges both the accuracy of the hypothetical presented to the vocational expert and the reliability of the vocational expert's response.

The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Queen complains that the hypothetical presented to the vocational expert was defective because it failed to reflect all of the work-related limitations supported by the record, particularly the limitations that Glickfield identified. This argument is no more than a restatement of his position that the RFC assessment is deficient and will not be addressed again.

Queen also contends that the vocational expert's testimony is unreliable because it conflicts with information in the <u>Dictionary of Occupational Titles</u>. Ruling 00-4p places an affirmative duty on the adjudicator to inquire into possible conflicts between vocational expert evidence and the DOT. *See generally* SOCIAL SECURITY RULING 00-4p. Administrative policy is to place primary reliance on the DOT, but Ruling 00-4p cautions that neither the DOT nor the vocational expert's evidence will automatically "trump" in cases of conflict, and vocational experts may be used at Steps Four and Five to resolve complex vocational issues. *See id.* The Ruling notes that the DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as performed in a specific setting, while a vocational expert may be able to provide more specific information about a job or occupation. *Id.* The Fifth Circuit has adopted a

similar prudent approach and holds that neither the DOT nor the vocational expert evidence is *per se* controlling: If faced with a conflict between the vocational expert and the DOT, the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis to do so. *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000).

When asked, the vocational expert denied that there was any conflict between her testimony and the DOT descriptions of the jobs she had identified. (Tr. 488). Queen challenges that testimony and argues that the sorter/inspector job is described as semi-skilled work in the DOT and work as a hand packager is classified as medium work activity; thus, two out of the three jobs named appear to exceed either his skill level or exertional capacity.[6] The third job is described as that of a "hand laborer" or "assembler," but Queen complains that these terms are too vague to allow him to locate a comparable job in the DOT.

The Commissioner responds that there is no conflict between the vocational expert's testimony and the DOT, and for support, the Commissioner cites numerous inspection, hand packaging, assembly, and sorting jobs in the DOT that comport with Queen's capacity for unskilled, light work activity. Queen's reply that there are just as many assembly, sorter, inspector, and packaging positions in the DOT that exceed his RFC is unpersuasive. The vocational expert did not testify that all categories inspection/sorter, assembly, and packing jobs would be suitable. The vocational expert testified about jobs available in significant numbers that would fit within the

---

[6] Queen asserts that eliminating any one of the three occupations the vocational expert identified would require remand because it affects ALJ's finding of a significant number of jobs. Queen relies on the district court's opinion in *Bagwell v. Barnhart*, 338 F.Supp.2d 723 (S.D. Tex. 2004), but that reliance is misplaced. The vocational expert in *Bagwell* had grouped all of the jobs together in arriving at the number of jobs available nationally and locally, instead of identifying the number of jobs available for each job individually. Thus, elimination of one job resulted in uncertainty about the number of jobs remaining that Bagwell could perform. *Id.* at 738.

restorations given by the ALJ. (Tr. 487-88). The value of vocational experts is their familiarity with the specific requirements of particular occupations, including working conditions and the attributes or skills needed. *See Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). The ALJ did not err in relying on the vocational expert's testimony, and the vocational expert's testimony constitutes substantial evidence to support the ALJ's decision at the fifth step of the sequential evaluation process.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings to address the issue of Queen's alleged illiteracy.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until October 10, 2007. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or

manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until October 10, 2007 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED SEPTEMBER 19, 2007.


_____/s/ Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE